**NOT FOR PUBLICATION**                                    [5]


## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                    :
PAIGE F. BAILEY,                    :        Civil Action No. 05-3739 (FLW)
                                    :
          Plaintiff,                :
     v.                             :             **OPINION**
                                    :
JO ANNE B. BARNHART,                :
COMMISSIONER OF SOCIAL              :
SECURITY,                           :
                                    :
          Defendant.                :
_____:


**WOLFSON, UNITED STATES DISTRICT JUDGE**

     Plaintiff Paige F. Bailey appeals from the final decision of the Commissioner of Social

Security, Jo Ann B. Barnhart ("Commissioner"), denying Plaintiff disability insurance benefits

under the Social Security Act.  Plaintiff asserts that the record, when considered in full,

substantiates her claim and requires a conclusion that she was disabled and entitled to benefits.

Specifically, Plaintiff maintains that Administrative Law Judge Ralph J. Muehlig ("the ALJ")

erred in: (1) failing to specify the listed impairments he considered, (2) finding that Plaintiff's

impairments do not satisfy the requirements of the Listings of Impairments, (3) failing to provide

support for his determination of Plaintiff's residual functional capacity, (4) finding that Plaintiff

retained the residual functional capacity to perform her past relevant work, and (5) conducting

the administrative hearing in a prejudicial manner.  Plaintiff's Brief ("Pl. Br.") at 9.  The Court

has jurisdiction over Plaintiff's appeal pursuant to 42 U.S.C. § 405(g).  For the reasons stated below, the Commissioner's decision will be remanded for further findings consistent with this Opinion.

## I.    BACKGROUND

Plaintiff Paige F. Bailey, who was fifty years old at the time the ALJ rendered his decision, alleges that she became disabled on October 2, 2001 as a result of an injury sustained in a June 26, 1996 automobile accident.  Administrative Record ("AR") 19-20.  Plaintiff is a high school graduate who most recently worked as a front desk clerk in a dental office.  Id. at 19.  Plaintiff previously worked as a materials handler, investment analyst, and sales clerk.  Id.

### A.    Procedural History

On November 13, 2001, Plaintiff filed an application for a period of disability, Disability Insurance Benefits, and Supplemental Security Income payments.  Id. at 50-52.  The application was denied initially and upon reconsideration.  Id. at 29-37.  Following denial of her application, Plaintiff requested a hearing before an ALJ, and offered testimony on March 25, 2003.  Id. at 18.  Plaintiff was represented at this hearing by Jeremy Solomon, Esq.  Id.  In his May 29, 2003 decision, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act.  Id. at 23.  Plaintiff petitioned the Social Security Appeals Council for review, but the Appeals Council denied Plaintiff's petition on June 3, 2005, making that decision the final decision of the Commissioner.  Id. at 9-11.  Plaintiff then initiated the current appeal, seeking reversal of the Commissioner's decision and a determination that she is entitled to a period of disability, Disability Insurance Benefits, and Supplemental Security Income payments.

### B.    Medical Evidence

2

Plaintiff suffers from disc herniation of the cervical spine, internal derangement of the left knee, reflex sympathetic dystrophy, and depression.  Id. at 23.  Plaintiff testified that because of pain in her neck, shoulder, and left knee, as well as pain and swelling of her left foot, she is unable to sit, stand, or walk for prolonged periods of time, and that she is also unable to lift heavy objects.  Id. at 992-93.  Plaintiff also testified that she relies on her husband to help with daily living activities such as housework, and that she feels depressed as a result of her physical limitations.  Id. at 963-64, 991-92.

On June 26, 1996, Plaintiff injured her left knee in an automobile accident.  Id. at 20. Following the accident, Plaintiff was examined by Dr. James Dwyer, an orthopedic surgeon, who provided Plaintiff with medications and cortisone injections, and referred Plaintiff to physical therapy.  Id. at 20, 395-96.  After receiving this treatment, Plaintiff continued to complain of severe knee pain, and Plaintiff had exploratory knee surgery on December 5, 1996.  Id. at 230, 348.  Following surgery, which revealed "an essentially unremarkable knee with the exception of a small contusion," Plaintiff continued to complain of pain.  Id. at 230, 348, 390.  Plaintiff also had an MRI of her knee, which came back negative.  Id. at 392.  In addition, in 1996-97, because Plaintiff's sales clerk job at the time required prolonged standing, Plaintiff's physician took her out of work for six months.  Id. at 392, 776.

Plaintiff was subsequently referred to Dr. Sharon Worosilo, a pain management specialist.  Id. at 390.  Dr. Worosilo's earliest examination of Plaintiff was on April 17, 1997.  Id. at 20.  Dr. Worosilo performed lumbar sympathetic blocks and steroid injections on Plaintiff over the next four years, but Plaintiff continued to complain of pain.  Id. at 156-216, 220-29.  On January 5, 1998, Dr. Worosilo concurred with a previous diagnosis of reflex sympathetic

dystrophy (RSD) but noted that Plaintiff did not exhibit the "classical" symptoms of RSD.  Id. at 348.

Dr. Worosilo referred Plaintiff to Dr. Kaufman for a consultation, and on May 23, 2001, Dr. Kaufman, another pain management specialist, began treating Plaintiff.  Id. at 472. Following a June 13, 2001 lumbar sympathetic ganglionectomy, Dr. Kaufman reported decreased swelling of Plaintiff's foot.  Id. at 465, 475.  On August 1, 2001, Dr. Worosilo stated that she had nothing more to offer Plaintiff.  Id. at 286.  Plaintiff returned to Dr. Worosilo on April 10, 2002, and Dr. Worosilo began a new course of lumbar facet injections on April 15, 2002.  Id. at 663.

On October 13, 1999, Dr. Thomas Nordstrom began treating Plaintiff, and reported pain and restricted neck motion but also the absence of multiple trigger points on November 24, 1999.  Id. at 629-30.  Plaintiff continued to report pain to Dr. Nordstrom in spite of medications and cortisone shots.  Id. at 605-30.  At Dr. Nordstrom's request, an MRI of Plaintiff's cervical spine was done on June 22, 2001; the MRI showed disc herniation at C5-6 and right neural foraminal stenosis.  Id. at 355.

On May 30, 2001, Dr. Edward Buch evaluated Plaintiff and reported a cervical disc problem but no problems with nerve conduction.  Id. at 252.  In 2002, Dr. Nordstrom reported poor motion of the neck and a positive straight leg raising test.  Id. at 591.  In 2002, Dr. Worosilo also reported decreased range of motion, but reported full motor skills and a negative straight leg raising test as well.  Id. at 651, 667.  In 2001, Dr. Kaufman reported full range of motion.  Id. at 468.  A May 15, 2002 MRI of Plaintiff's lumbar spine revealed a normal exam and no disc herniation, spinal stenosis, or foraminal narrowing.  Id. at 631.

In 2000, Dr. Worosilo recommended that Plaintiff elevate her leg and ankle three times a

4

day for thirty minutes.  AR 304-05.  In 2001, Drs. Kaufman and Toma also recommended that she do stretching exercises and start to exercise, including using a stationary bicycle.  AR 902, 919-20.  In 2000 and 2001, Drs. Quevedo and Brown further reported that Plaintiff was unable to take part in strenuous exercise such as aerobics, weight training, or yoga, and that she was unable to shop for more than two hours.  AR 453, 456.  Dr. Nordstrom reported in 2002 that Plaintiff had attempted to exercise as well.  AR 596.

On November 26, 2001, Dr. Eden Atienza reviewed the medical record at the request of the Social Security Administration ("the Administration") and evaluated Plaintiff's residual functional capacity.  Id. at 491-98.  Dr. Atienza concluded that in an eight hour workday Plaintiff could sit about six hours, stand and/or walk at least two hours, frequently lift and/or carry ten pounds, and occasionally lift and/or carry twenty pounds.  Id. at 492.  Dr. Atienza further stated that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, or crawl.  Id. at 493.  On February 6, 2002, Dr. Lilia Pineda reviewed the record at the request of the Administration and concurred with the opinion provided by Dr. Atienza.  Id. at 565.

On February 3, 1999, Dr. Joseph Rochford, a psychiatrist, began treating Plaintiff for depression resulting from her physical condition.  Id. at 940-42.  Dr. Rochford prescribed multiple antidepressants, but Plaintiff was not able to tolerate the side effects.  Id. at 942.  Most recently, Dr. Rochford prescribed Wellbutrin for Plaintiff.  Id.  Dr. Rochford treated Plaintiff about once a month, and noted that Plaintiff reported difficulty sleeping, tearful episodes, decreased appetite, decreased energy, and feelings of hopelessness.  Id. at 941, 964.  Dr. Rochford also reported that Plaintiff's social interaction and adaptation were "somewhat impaired" due to her depression.  Id. at 942.  He further reported that Plaintiff was able to drive

her car, manage her own money, prepare meals, and to shop.  Id.  Dr. Rochford also found that

Plaintiff had intact ability to reason, use judgment, and make occupational and personal

decisions.  Id. at 544.  In addition, Dr. Brown examined Plaintiff on October 2, 2001 and found

that she was independent in her activities of daily living.  Id. at 453.

On December 18, 2001, J. Shapiro, Ph.D., a psychologist, reviewed the record at the

request of the Administration and evaluated Plaintiff's mental residual functional capacity.  Id. at

547-64.  Dr. Shapiro stated that Plaintiff had moderate restrictions of activities of daily living;

moderate difficulties in maintaining social functioning; moderate difficulties maintaining

concentration, persistence, or pace; and no episodes of decompensation.  Id. at 561.  Dr. Shapiro

also found that Plaintiff's depression was characterized by anhedonia, sleep disturbance,

decreased energy, and difficulty concentrating or thinking.  Id. at 554.  On February 9, 2002, J.

Wieliczko, Ph.D., a psychologist, reviewed the record at the request of the Administration and

seconded this opinion.  Id. at 551.

Dr. Marvin Chirls, the medical expert[1], reviewed the medical evidence but did not

examine Plaintiff, and testified that Plaintiff had internal derangement of the left knee and "pain

without physical findings to substantiate that pain."  Id. at 967, 969.  Dr. Chirls noted that apart

from the MRIs there were no physical or neurological findings to support the diagnosis of a

herniated disk.  Id. at 968, 973-74.  Dr. Chirls also stated that he did not see any proof of reflex

sympathetic dystrophy.  Id. at 976, 981.  He further testified that Plaintiff did not have

fibromyalgia because only two of the required eleven trigger points were indicated.  Id. at 967.

---

[1]Dr. Chirls' testimony does not make clear whether he was retained by Plaintiff or by the
Administration.  AR 966-84.

Dr. Chirls also testified that photos of swelling and discoloration of Plaintiff's feet did not support a finding of significant limitations.  Id. at 979.

## II.      DISCUSSION

### A.      Standard of Review

On review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); see also Matthews v. Apfel, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions as to questions of fact are conclusive upon a reviewing court if supported by "substantial evidence in the record."  42 U.S.C. § 405(g); Knepp v. Apfel, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must scrutinize the entire record to determine whether the Commissioner's findings are supported by such evidence, Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978), the standard is "highly deferential."  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance.  McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate."  Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the factfinder."  Williams v. Sullivan, 970 F.3d 1178, 1182 (3d Cir. 1992).  Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence.  See Simmonds v. Heckler, 807 F.2d 54, 58 (3d Cir. 1986).

**B.      Standard for Entitlement of Benefits**

To establish a disability under the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); see also Plummer, 186 F.3d at 427.  An individual is not under a disability unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

The Social Security Administration has promulgated regulations setting forth a five-step evaluation process for determining whether a claimant is disabled.  20 C.F.R. § 404.1520; see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987); Plummer, 186 F.3d at 428.  In step one, the Commissioner must first determine whether the claimant has shown that she is not currently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a).  If a claimant is found to be engaged in substantial gainful activity, the claim will be denied.  Bowen, 482 U.S. at 140.

If the claimant is not performing substantial gainful activity, the Commissioner proceeds to step two to determine whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits her physical or mental ability to perform basic work activities.  20 C.F.R. § 404.1520(c); see also Bowen, 482 U.S. at 140-41.  If a claimant fails to show that her impairments are severe, she is ineligible for disability benefits. Bowen, 482 U.S. at 141; Plummer, 186 F.3d at 428.

If the claimant is not performing substantial gainful activity and has a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, the Commissioner then addresses, under step three, whether the claimant's impairment meets or medically equals a listed impairment contained in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listings of Impairments").  See 20 C.F.R. § 404.1520(d); Bowen, 482 U.S. at 141.  If the Commissioner finds that the claimant's impairment meets a listed impairment, the claimant has satisfied her burden of proof, is presumed disabled, and is entitled to benefits.  Id.

If the Commissioner determines that the claimant is not conclusively disabled under the criteria set forth in the Listing of Impairments, step three is not satisfied and the ALJ must consider at step four whether the claimant retains the residual functional capacity to perform her past relevant work.  20 C.F.R. § 404.1520(d); Bowen, 482 U.S. at 141; Plummer, 186 F.3d at 428.  If the claimant is able to perform her previous work, the claimant is determined not to be disabled.  20 C.F.R. §§ 404.1520(e), 416.920(e); Bowen, 482 U.S. at 141-42.  The claimant bears the burden of demonstrating an inability to return to the past relevant work.  Plummer, 186 F.3d at 428.

Finally, if the Commissioner determines that the claimant is no longer able to perform her previous work, the burden of production shifts to the Commissioner, at step five, to show that the claimant is capable of performing other work available in the national economy.  20 C.F.R. § 404.1520(f); Plummer, 186 F.3d at 428.  The Commissioner must show that there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with the claimant's medical impairments, age, education, past work experience, and residual functional capacity.  Id.  The Commissioner must analyze the cumulative effect of all of

the claimant's impairments in determining whether the claimant is capable of performing work and is not disabled.  Id.

### C.   Decision and Findings of the Administrative Law Judge

After consideration of the record, the ALJ made the following findings:

1.   The claimant met the disability insured status requirements of the Act on October 2, 2001, the date the claimant stated she became unable to work, and continues to meet them through December 31, 2005.

2.   The claimant has not engaged in substantial gainful activity since October 2, 2001.

3.   The claimant is severely impaired by disc herniation of the cervical spine, internal derangement of the left knee, reflex sympathetic dystrophy and depression, but she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.   The claimant's allegations regarding symptoms and limitations were credible only to the extent that they are consistent with this decision.

5.   The claimant retains the ability to lift and carry ten pounds occasionally, to stand/walk at least two hours out of an eight hour workday and sit for at least six hours in an eight hour workday, as required for sedentary work.  The claimant can only occasionally climb, balance, stoop, kneel, crouch or crawl.  Further, she retains the ability to understand, remember and carry out simple instructions, interact appropriately with coworkers and supervisors, and adapt to a routine work environment.

6.   Using parts "A" and "B" of the psychiatric review technique, the claimant's depression is characterized by anhedonia, appetite disturbance with change in weight, sleep disturbance, decreased energy, and difficulty concentrating or thinking.  With respect to resulting functional limitations, the claimant has moderate restrictions of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties maintaining concentration, persistence or pace, and no episodes of decompensation.  The evidence does not establish the presence of the "C" criteria under section 12.04. (20 CFR 404.1545).

7.   The claimant's past relevant work as front desk clerk did not require the performance of work-related activities precluded by the above limitations (20 CFR 404.1565).

8.   The claimant's impairments do not prevent her from performing her past relevant work.

9.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR 404.1520(e) & (f)).

AR 23-24.

The ALJ's decision became final as the decision of the Commissioner of Social Security on June 3, 2005.  Id. at 9-11.

### D.      Plaintiff's Claims on Appeal

On appeal, Plaintiff contends that (1) the ALJ erred in failing to state the listed impairments that he considered, (2) the ALJ erred in determining that Plaintiff's impairments do not satisfy the requirements of the Listings of Impairments, (3) the ALJ erred in failing to provide support for his determination of Plaintiff's residual functional capacity, (4) the ALJ erred in determining that Plaintiff retained the residual functional capacity to perform her past relevant work, and (5) the ALJ conducted the administrative hearing in a prejudicial manner.  Pl. Br. at 9.

### 1.      The ALJ's Failure to State the Listed Impairments That He Considered

The ALJ found that Plaintiff had satisfied steps one and two of the five-step process.  In step three, the ALJ was required to determine whether Plaintiff's impairments meet, or are equivalent to, one of the listed impairments.  Plaintiff contends on appeal that the ALJ erred by not stating the listings that he considered in his step three analysis.

Plaintiff asserts that Burnett v. Commissioner of Social Security Administration, 220 F.3d 112 (3d Cir. 2000), mandates a conclusion that Plaintiff be awarded benefits under the Social Security Act, or that the matter be remanded for the ALJ to provide a rationale for his decision.  In Burnett, the Third Circuit held that the ALJ's conclusory statement that the plaintiff's impairments did not meet or equal any listed impairments precluded meaningful judicial review because the ALJ had failed to identify the relevant listed impairments, discuss the evidence, or explain his reasoning.  Id. at 119-20.

However, the Third Circuit has subsequently refined the step three standard set forth in

Burnett and has adopted a more flexible approach.  In Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004) the Third Circuit stated that Burnett did not require the ALJ to use particular language or adhere to a particular format in conducting his analysis, as long as there was sufficient development of the record and explanation of findings to permit meaningful review.  An ALJ's step three analysis is sufficient if the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that the plaintiff did not meet the requirements of any listed impairment.  Id.  The Third Circuit thus upheld a step three analysis where the ALJ had clearly evaluated the medical evidence in the record but had not identified or analyzed the most relevant listed impairment.  Id.

Similarly, in Arroyo v. Commissioner of Social Security, 155 Fed. Appx. 605, 607 (3d Cir. 2005), the Third Circuit upheld a step three analysis in which the ALJ clearly and fully evaluated the medical evidence in the record but failed to specifically mention any listed impairments.  The Third Circuit stated, "[a]lthough we would encourage ALJs to specifically identify the listed impairments under consideration, we are able to discern the particular listed impairments considered in this [case] based on the ALJ's discussion of the relevant evidence and his related conclusion that Arroyo's combined impairments were not severe enough to 'meet or medically equal one of the listed impairments.'"  Id. at 608.

The ALJ's step three analysis in the present case satisfies the standard set forth in Burnett and subsequently refined in Jones and Arroyo.  As in Arroyo, while the Court encourages ALJs to specify the listed impairments they consider, the Court is able to discern the listed impairments considered in this case based on the ALJ's discussion of the relevant evidence and his conclusion that Plaintiff did not meet or medically equal any of the listed impairments.  When viewed as a

12

whole, the ALJ's decision clearly indicates that he compared Plaintiff's herniated disc of the

cervical spine with the listing for disorders of the spine, Listing 1.04.[2]  The ALJ cited Plaintiff's

2001 MRI of the cervical spine which showed disc herniation with compression of the spinal

cord and right neural foraminal stenosis.  AR 20.  He also cited Dr. Nordstrom's reports of pain

and restricted motion of the neck, and subsequent reports of persistent pain.  Id.  The ALJ also

considered Plaintiff's testimony and concluded that "while the claimant may experience some

subjective degree of discomfort.... her testimony was not supported by clinical findings or

objective diagnostic studies."  Id. at 22.

The ALJ thus provided sufficient analysis for meaningful review of his finding that

Plaintiff did not meet Listing 1.04.  Upon review of the record, the Court finds that the ALJ's

finding that Plaintiff did not meet Listing 1.04 is supported by substantial evidence.  In addition

to the previously discussed evidence, the record contains no evidence of muscle weakness or

impaired motor function, as required by Listing 1.04.  AR 243, 468, 667, 909, 920.  Furthermore,

Plaintiff's cervical disc "is not shown to have any nerve involvement."  Id. at 252.  The record

--------

[2]Listing 1.04, "Disorders of the spine...resulting in compromise of a nerve root... or the spinal cord," requires:
A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.
20 C.F.R. § 404, Subpt. P, App. 1, Listing 1.04.

also shows that Plaintiff does not have lumbar spinal stenosis.[3]  AR 348, 592, 631.  Finally, the

record is devoid of evidence of any suggestion or confirmation of spinal arachnoiditis.

The ALJ's decision, viewed as a whole, also shows that he compared Plaintiff's knee

impairment to the listings for impairments of major weight-bearing joints, Listings 1.03 and

1.02.[4]  The ALJ cited Plaintiff's knee surgery and that it showed a contusion but no bone fracture

or torn meniscus.  AR 20.  The ALJ also cited Dr. Atienza's conclusion that Plaintiff could

stand/walk about two hours.  Id.  Additionally, as previously mentioned, the ALJ considered

Plaintiff's testimony on her pain and physical limitations.  Id. at 22.

The ALJ's conclusion that Plaintiff did not meet these listings is supported by substantial

evidence.  The record shows that Plaintiff's knee surgery was exploratory in nature, and that it

revealed "an essentially unremarkable knee with the exception of a small contusion."  AR 230,

348.  There is also no evidence that Plaintiff is unable to ambulate effectively, as required by

---

[3]In alleging that she meets Listing 1.04C, Plaintiff thus appears to confuse her mild right neural foraminal stenosis of the *cervical* spine with the *lumbar* spinal stenosis required for Listing 1.04C.  See Pl. Br. at 22.

[4]Listing 1.03, "Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint," requires "inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset."
20 C.F.R. § 404, Subpt. P, App. 1, Listing 1.03.
Listing 1.02, "Major dysfunction of a joint(s) (due to any cause)," reads:
Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2B; or
B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.
20 C.F.R. § 404, Subpt. P, App. 1, Listing 1.02.

Listings 1.03 and 1.02 – none of Plaintiff's physicians opine that she is unable to walk, nor is

there any evidence that Plaintiff requires a hand-held assistive device to walk.[5]

The ALJ's decision further shows that he compared Plaintiff's depression to the listing

for mood disorders, Listing 12.04.[6]  The ALJ found that Plaintiff's depression was characterized

---

[5]Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without use of a hand-held assistive device(s) that limits the functioning of both upper extremities. 20 C.F.R. § 404, Subpt. P, App. 1, Listing 1.00(B)(2)(b).

[6]Listing 12.04, "Affective Disorders," reads in pertinent part:
Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome.  Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
A. Medically documented persistence, either continuous or intermittent, of one of the following:
1. Depressive syndrome characterized by at least four of the following:
    a. Anhedonia or pervasive loss of interest in almost all activities; or
    b. Appetite disturbance with change in weight; or
    c. Sleep disturbance; or
    d. Psychomotor agitation or retardation; or
    e. Decreased energy; or
    f. Feelings of guilt or worthlessness; or
    g. Difficulty concentrating or thinking; or
    h. Thoughts of suicide; or
    i. Hallucinations, delusions or paranoid thinking;... and
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration; or
C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to

by anhedonia, appetite disturbance with change in weight, sleep disturbance, decreased energy, and difficulty concentrating or thinking.  AR 22.  The ALJ also found that Plaintiff had moderate restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation.  Id.  In addition, the ALJ found that Plaintiff did not meet the C criteria of Listing 12.04.  Id.

Upon review, the Court finds that the ALJ's determination that Plaintiff did not meet Listing 12.04 is supported by substantial evidence.  In particular, the record supports the ALJ's conclusion that Plaintiff did not meet the B requirements of Listing 12.04 because her limitations were moderate and not marked.[7]  Plaintiff's psychiatrist, Dr. Rochford, reported that Plaintiff was able to drive her car, manage her own money, prepare meals, and shop.  Id. at 942.  He also found that Plaintiff's social interaction and adaptation were "somewhat impaired" due to her depression.  Id.  In addition, while Dr. Rochford noted Plaintiff's complaints of impaired concentration, he did not assess her concentration or ability to perform work related tasks.  Id.  Psychologist J. Shapiro, Ph.D., who reviewed the record at the request of the Administration, also found that Plaintiff did not meet the B criteria of Listing 12.04 because she was only

_____

cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.
20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.04.

[7]Listing 12.00(C) explains what is required for a limitation to be considered marked:
Where we use "marked" as a standard for measuring the degree of limitation, it means more than moderate but less than extreme.  A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis.
20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.00(C).

moderately limited in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace.  Id. at 561.  Dr. Shapiro also found that Plaintiff was not limited by episodes of decompensation, and that she did not meet the C criteria of Listing 12.04. Id. at 561-62.

The ALJ's decision shows that he compared Plaintiff's reflex sympathetic dystrophy[8] to the listing for physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms, Listing 12.07.[9]  As previously discussed, the ALJ found that Plaintiff

---

[8]Reflex sympathetic dystrophy (RSD) is a chronic pain syndrome most often resulting from trauma to a single extremity.  SSR 03-02p.

[9]Although Plaintiff does not specifically contend that she meets Listing 12.07, Dr. Shapiro, the psychologist who reviewed the record for the Administration, considered this listing and concluded that Plaintiff did not meet the requirements of Listing 12.07, which reads:
Somatoform Disorders: Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.
The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
A. Medically documented by evidence of one of the following:
1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or
2. Persistent nonorganic disturbance of one of the following:
a. Vision; or
b. Speech; or
c. Hearing; or
d. Use of a limb; or
e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or
f. Sensation (e.g., diminished or heightened).
3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury; and
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.
20 C.F.R. § 404, Subpt. P, App. 1, Listing 12.07.

17

experienced moderate – not marked – limitations in activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace.  AR 22.  The ALJ also noted that Plaintiff did not display the "classical" symptoms of reflex sympathetic dystrophy.  Id. at 22.

The ALJ's finding that Plaintiff did not meet this listing is thus supported by substantial evidence.  Plaintiff experienced decreased hypersensitivity and swelling of her leg in 2001.  Id. at 286, 469.  Moreover, Dr. Shapiro concluded that Plaintiff did not meet the requirements of this listing.  Id. at 551.

Plaintiff also contends that the ALJ erred in finding that her reflex sympathetic dystrophy (RSD) does not meet a listed impairment, either alone or combined with her other impairments.  Pl. Br. at 23-24.  The Commissioner has stated that RSD without other impairments does not meet any listed impairment, and that RSD should be compared to other listings to determine if there is medical equivalence:

> Since RSDS/CRPS [reflex sympathetic dystrophy syndrome/complex regional pain syndrome] is not a listed impairment, an individual with RSDS/CRPS alone cannot be found to have an impairment that meets the requirements of a listed impairment.  However, the specific findings in each case should be compared to any pertinent listing to determine whether medical equivalence may exist.  Psychological manifestations related to RSDS/CRPS should be evaluated under the mental disorders listings, and consideration should be given as to whether the individual's impairment(s) meets or equals the severity of a mental listing.

SSR 03-02p.

Plaintiff alleges that her impairments, when considered in the aggregate and including her reflex sympathetic dystrophy, are medically equivalent to a listed impairment, in particular, Listing 12.04.  Pl. Br. at 24.  To prove medical equivalence under 20 C.F.R. § 404.1526(a), a claimant must proffer medical findings which are equal in severity to all the criteria for the one most similar listed impairment.  Stremba v. Barnhart, 171 Fed. Appx. 936, 938 (3d Cir. 2006)

18

(citing Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990)).  An impairment that manifests only some of those criteria, no matter how severely, does not qualify.  Id.  In its preceding analysis of whether Plaintiff meets specific listed impairments, the Court considered evidence of Plaintiff's RSD and concurred with the ALJ that the RSD in combination with the other impairment(s) was not medically equal to the listed impairments at issue.

Thus, the Commissioner's determination that Plaintiff has not satisfied her burden in the step three analysis is supported by substantial evidence.

### 2.    The ALJ's Determination of Whether Plaintiff's Residual Functional Capacity Enables Her to Return to Her Previous Work

In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work.  This step includes three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity, (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work, and (3) the ALJ must compare the claimant's residual functional capacity to the past relevant work and determine whether the claimant has the level of capability needed to perform the past relevant work.  Burnett, 220 F.3d at 120.  Plaintiff maintains that the ALJ committed three errors in his step four determination of Plaintiff's residual functional capacity to perform her past relevant work: (1) that the ALJ failed to provide a sufficient analysis for his residual functional capacity assessment, (2) that the ALJ erred in his determination of Plaintiff's residual functional capacity, including not giving sufficient weight to Plaintiff's complaints of pain, and (3) that the ALJ erred in concluding that Plaintiff's residual functional capacity permitted her to return to her previous position as a front desk clerk.

Plaintiff asserts that the ALJ failed to provide a sufficient analysis for his residual

19

functional capacity assessment.  Pl. Br. at 27.  In assessing residual functional capacity, the ALJ must consider all evidence before him, and while the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reasoning for discounting such evidence.  Burnett, 220 F.3d at 121.

Plaintiff alleges that "the ALJ offers not a shred of explanation in support of" his assessment of Plaintiff's residual functional capacity.  Pl. Br. at 27.  However, the ALJ's opinion clearly indicates that he considered the medical evidence and explained the reasoning underlying his determination of Plaintiff's residual functional capacity.  The ALJ devoted over two pages of his opinion to a discussion of the evidence.  AR 19-21.  The ALJ also cited Dr. Atienza's conclusion on Plaintiff's residual functional capacity.  Id. at 20.  In addition, the ALJ made clear that he had considered Plaintiff's testimony and found that it was not supported by clinical findings or objective diagnostic studies – in particular, Dr. Worosilo's notation that Plaintiff did not display the "classical" symptoms of reflex sympathetic dystrophy (RSD), Dr. Nordstrom's finding that Plaintiff did not have multiple trigger points, the absence of physical limitations from Plaintiff's physicians in spite of Plaintiff's persistent complaints, and the infrequency of Plaintiff's psychiatric sessions.  Id. at 22.

The Court thus finds that the ALJ's analysis in determining Plaintiff's residual functional capacity was sufficient for meaningful review.  Upon review, the Court concludes that substantial evidence supports the ALJ's determination of Plaintiff's residual functional capacity.[10]  A review

---

[10]In the present case, the ALJ found that Plaintiff had the ability to lift and carry ten pounds occasionally, to stand/walk at least two hours out of an eight hour workday, and to sit for at least six hours in an eight hour workday, as required for sedentary work.  AR 22.  The ALJ also found that Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, or crawl, and that Plaintiff retained the ability to understand, remember, and carry out simple instructions;

of the record fails to disclose any evidence from a treating physician that contradicts the determination that Plaintiff can sit for at least six hours a day, stand/walk two hours a day, and carry ten pounds occasionally.  While the record reflects that Plaintiff's physician took her out of work for six months in 1996-97 because her job at that time, as a store sales clerk, required prolonged standing, the record shows that none of Plaintiff's physicians advised Plaintiff to leave her front desk clerk job in 2001.  AR 392, 776.  The record reflects that Plaintiff's physical limitations include an inability to take part in strenuous exercise such as aerobics, weight training, or yoga, as well as an inability to shop for more than two hours.  Id. at 453, 456.  Finally, the record shows that Dr. Eden Atienza reviewed the record at the request of the Administration and concluded that in an eight-hour workday Plaintiff could sit about six hours, stand and/or walk at least two hours, frequently lift and/or carry ten pounds, and occasionally lift and/or carry twenty pounds.  Id. at 492.

With respect to mental impairments, Plaintiff's psychiatrist, Dr. Rochford, found that Plaintiff had intact ability to reason, use judgment, and make occupational and personal decisions.  Id. at 544.  Dr. Rochford also found that Plaintiff's social interaction and adaptation were somewhat impaired, and that she was able to drive her car, manage her own money, prepare meals, and shop.  Id. at 544.  Psychologist J. Shapiro, Ph.D., who reviewed the record at the request of the Administration, found that Plaintiff's depression was characterized by anhedonia, sleep disturbance, decreased energy, and difficulty concentrating or thinking.  Id. at 554.  Dr. Shapiro also found that Plaintiff was only moderately limited in activities of daily living,

---

interact appropriately with coworkers and supervisors; and adapt to a routine work environment. Id.

maintaining social functioning, and maintaining concentration, persistence, or pace, and that she was not limited by episodes of decompensation.  Id. at 561.  The ALJ's determination of Plaintiff's mental residual functional capacity is therefore supported by substantial evidence.

Plaintiff further contends that the ALJ failed to give sufficient weight to Plaintiff's subjective complaints of pain.  The ALJ must give serious consideration to Plaintiff's subjective complaints of pain.  Welch v. Heckler, 808 F.2d 264, 270 (3d Cir. 1986).  However, the ALJ is not obliged to accept without question the credibility of such subjective evidence.  Lacorte v. Bowen, 678 F. Supp. 80, 83 (D.N.J. 1988) (quoting Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)).  "The ALJ has discretion 'to evaluate the credibility of a claimant and to arrive at an independent judgment in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant.'"  Id. (quoting Brown v. Schweiker, 562 F.Supp. 284, 287 (E.D. Pa. 1983) (internal citations omitted)).  The Court defers to the ALJ's determination of credibility since the ALJ had the opportunity to assess the demeanor of the witness at the hearing.  Maloney v. Massanari, 38 Fed. Appx. 820, 821 (3d Cir. 2002) (citing Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001)).

In this case, the ALJ concluded that Plaintiff's allegations regarding her limitations and pain were not totally credible in light of the medical evidence.  In particular, the medical evidence in the record, as examined earlier in this discussion, did not support the full extent of pain and mental limitations that Plaintiff claimed.  As a result, I defer to the ALJ's determination of Plaintiff's credibility.

### 3.     The ALJ's Determination that Plaintiff's Residual Functional Capacity Enabled Her to Return to Her Previous Work

Plaintiff alleges that the ALJ erred in concluding that Plaintiff's residual functional

capacity enabled her to return to her previous work as a front desk clerk. Pl. Br. at 29.  The ALJ

found that Plaintiff's previous front desk clerk position was semi-skilled and sedentary.  AR 19.

This finding is in accord with the Dictionary of Occupational Titles ("DOT"), which lists the job

of receptionist as semi-skilled.  See DOT at 237.367-038.  The ALJ also found that Plaintiff

retained the mental residual functional capacity to understand, remember, and carry out simple

instructions; interact appropriately with coworkers and supervisors; and adapt to a routine work

environment.  Id. at 22.  Plaintiff points out that such mental residual functional capacity enables

a claimant to perform unskilled work, as explained by the Commissioner:

> The basic mental demands of competitive, remunerative, unskilled work include
> the abilities on a sustained basis to understand, carry out and remember simple
> instructions; to respond appropriately to supervision, co-workers and usual work
> situations and deal with changes in routine work setting.

SSR 85-15.

Plaintiff thus contends that the ALJ's implicit finding that Plaintiff has the mental residual

functional capacity to perform unskilled work is at odds with the ALJ's conclusion that Plaintiff

can return to her previous *semi-skilled* work as a front desk clerk.  Pl. Br. at 29.  The ALJ does

not state in his opinion that he finds that Plaintiff has the residual functional capacity to perform

semi-skilled work.  Moreover, as discussed earlier, the record supports the ALJ's finding that

Plaintiff has moderate – and not marked – difficulties maintaining concentration, persistence, or

pace.

The Court thus finds that the ALJ has not made sufficient findings in concluding that

Plaintiff had the residual functional capacity to return to her previous work.  On remand, the ALJ

should fully develop the record and make specific findings as to the mental demands of

23

Plaintiff's past relevant work and Plaintiff's ability to fulfill these demands.[11]

> **4.     Plaintiff Alleges that the ALJ Conducted the Hearing in a Prejudicial Manner**

Plaintiff alleges that the ALJ's conduct of the hearing was prejudicial to Plaintiff's case. While due process requires an impartial decision-maker in administrative proceedings, Schweiker v. McClure, 456 U.S. 188, 195-96 (1982), a presumption of honesty and integrity exists in those who serve as adjudicators for administrative agencies.  Winthrow v. Larkin, 421 U.S. 35, 47 (1975).  The burden of overcoming this presumption rests on the party making the assertion of bias.  McClure, 456 U.S. at 195-96.  Plaintiff can rebut the presumption by showing a conflict of interest or some other specific reason for disqualification.  Id.  Plaintiff must also show that the ALJ's conduct was so extreme that it deprived the hearing of the impartiality necessary for fundamental fairness.  Gimbel v. Commodity Futures Trading Commission, 872 F.2d 196, 198 (7th Cir. 1989)(citing N.L.R.B. v. Webb Ford, Inc., 689 F.2d 733, 737 (7th Cir. 1982).  While the Court is troubled by the extraneous comments made by the ALJ during Plaintiff's testimony, see, e.g., AR 953-54, Plaintiff has not demonstrated that the ALJ's conduct was so extreme that it deprived the hearing of the impartiality necessary for fundamental fairness.

## III.     CONCLUSION

For the reasons set forth above, the Court finds the ALJ's step four analysis insufficient, and the case is remanded on this basis.  On remand, the ALJ shall explain his findings at step four, including an analysis of whether and why Plaintiff has the mental residual functional

---

[11]Should the ALJ find Plaintiff to have a residual functional capacity for unskilled work and that Plaintiff's past relevant work was semi-skilled, then the ALJ must enter a finding that Plaintiff lacks the residual functional capacity to perform her past relevant work.

capacity to perform her past previous work.


                                                    /s/ Freda L. Wolfson
_____   The Honorable Freda L. Wolfson
                                           United States District Judge


Date:   September 27, 2006

25